**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **MIRIAM AIDE CARCAMO-LOPEZ,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-09-CV-371-KC** |
| | § | |
| **DOES 1 through 20, inclusive, AS** | § | |
| **BORDER PATROL AGENTS WITH** | § | |
| **UNITED STATES CUSTOMS &** | § | |
| **BORDER PROTECTION,** | § | |
| **DEPARTMENT OF HOMELAND** | § | |
| **SECURITY and in their individual** | § | |
| **capacities, and THE UNITED STATES** | § | |
| **OF AMERICA, and RICARDO R.** | § | |
| **MONTALVO SUED AS A NEW** | § | |
| **DEFENDANT AND AS DOE 1,** | § | |
| | § | |
| **Defendants.** | § | |

## ORDER

On this day, the Court considered Defendant Ricardo R. Montalvo's ("Montalvo")

Motion for Summary Judgment ("Montalvo's Motion"), ECF No. 65, and the Government's

Motion to Dismiss or, in the alternative, Motion for Summary Judgment ("Government's

Motion"), ECF No. 66. For the reasons set forth below, Montalvo's Motion is **GRANTED** and

the Government's Motion is **GRANTED** in part and **DENIED** in part.

## I.    BACKGROUND

The following facts are undisputed, except where otherwise noted.

On the night of February 2, 2008, Plaintiff was attempting to illegally cross the Rio

Grande, which forms the international border between Ciudad Juarez, Mexico and El Paso,

Texas. Def. Ricardo Montalvo's Proposed Undisputed Facts ("Montalvo's Facts") ¶ 32, ECF

No. 62. She was wearing a dark blue sweater and jeans, *id.* ¶ 30, and had agreed to attempt the

crossing with two men who were also attempting to enter the United States illegally. Pl.'s

Disputed Issues of Material Fact ("Plaintiff's Facts") ¶ 1, ECF No. 73.  At that time of year, the riverbed of the Rio Grande is virtually dry.  Montalvo's Facts ¶ 3.  Running alongside the river is a floodplain area known as the "vega."  *Id.*  The vega has varying sizes of weeds and is scattered with small scrub trees.  *Id.*

Plaintiff and her companions were attempting to cross the border at a point to the east of one of the bridges that leads to the international ports of entry on either side of the border.  *Id.* Plaintiff contends they were attempting to cross twenty to twenty-five yards east of the bridge, so that lamps on the bridge illuminated the area.  Pl.'s Resp. to Def. Montalvo's Proposed Undisputed Facts ("Plaintiff's Response to Montalvo's Facts") ¶¶ 3-4, ECF No. 73.  Defendants contend the crossing point was fifty-five yards east of the bridge, and the ambient lighting did not fully reach the vega, lighting some portions but casting shadows on others.  Montalvo's Facts ¶ 4; Ricardo Montalvo Deposition ("Montalvo Deposition") 65:9-14, ECF No. 65-3.

Plaintiff and her two companions had walked across the riverbed and were hidden in the brush on the edge of the riverbed, about to cross the vega.  Pl.'s Facts ¶¶ 1-2.  They were waiting for a Border Patrol vehicle, a Chevrolet Tahoe, to move from where it was stopped on a dirt road on the far side of the vega from them.  *Id.* ¶ 1.  Montalvo was driving the Border Patrol vehicle. Montalvo's Facts ¶ 5.  Montalvo began driving east, away from Plaintiff and her companions, at which point they left their hiding place in the brush on the riverbank and began crossing the vega.  Pl.'s Facts ¶ 2; Montalvo's Facts ¶ 27.  While they were crossing the vega, Montalvo turned again and began driving west back towards his earlier position.  Pl.'s Facts ¶ 5; Montalvo's Facts ¶ 6.  Believing he had detected movement on the vega to his south, Montalvo stopped his vehicle and shined a spotlight in that direction.  Montalvo's Facts ¶ 7.

While he was stopped, Plaintiff was positioned facing Montalvo in his vehicle, twenty

meters away, with the vehicle's headlights shining in her direction.  Pl.'s Facts ¶ 5.  Plaintiff

contends she was in a sandy, bare area of the vega, while Defendants allege the area was uneven

and had significant brush.  *Id.* ¶ 6; Montalvo's Objections to Pl.'s Resp. to Montalvo's Facts ¶ 6,

ECF No. 89.  Believing Montalvo had seen her, Plaintiff crouched on her knees and awaited

Montalvo's instructions.  Pl.'s Facts ¶¶ 6, 8.  Plaintiff alleges Montalvo was stopped with his

lights on her for seven to ten minutes.  *Id.* ¶ 9; Miriam Aide Carcamo-Lopez Deposition

("Carcamo Deposition") 188:24-25, ECF No. 65-2.  Defendants contend he was only stopped for

less than a minute.  Montalvo Dep. 68:18-25.  However long the time, after Montalvo had been

stopped but had not given her any instructions or exited his vehicle to detain her, Plaintiff began

to get scared and began to rise to her feet.  Pl.'s Facts ¶ 9.  At the same time, Montalvo began

driving west towards her and, despite Plaintiff's attempts to avoid the vehicle, Montalvo drove

over her with his back tires as he turned towards the south, beginning to turn his vehicle to the

east once more.  *Id.* ¶ 10; Montalvo's Facts ¶ 7; Montalvo Dep. 69:21-70:24.

As Montalvo turned south, he realized based on the illumination of the southern area of

the vega with his headlights that the shadows he had seen with his spotlight were in fact

Plaintiff's two companions, hiding in the brush and shadows.  Montalvo's Facts ¶ 7.  He stopped

his vehicle and got out to pursue the two men, who were fleeing south towards the river and

Mexico.  *Id.* ¶ 9.  At that point, he heard Plaintiff screaming from behind his truck, and walked

back to investigate.  *Id.* ¶ 10.  He discovered Plaintiff lying on the ground.  *Id.*  Defendants

contend Plaintiff was partially covered by brush and tumbleweeds, while Plaintiff denies this.

*Id.*; Pl.'s Resp. to Montalvo's Facts ¶ 10.  Montalvo asked Plaintiff what she was doing there, to

which Plaintiff responded that Montalvo had just run her over.  Montalvo's Facts ¶ 12.

Montalvo then reported the incident to his supervisor, who told Montalvo to contact El

Paso's Emergency Medical Services. *Id.* ¶ 13. Because of the rough terrain and the difficulty of getting an ambulance to the scene of the accident without landmarks or a street address, Montalvo determined that it would be easier and faster to get Plaintiff medical care if he placed her in his vehicle and took her to meet the ambulance. *Id.* ¶¶ 13-14; Montalvo Dep. 108:14-109:5. So, he first backed his vehicle closer to where Plaintiff was lying on the ground. Montalvo's Facts ¶ 13. The parties dispute, however, exactly what Montalvo did to get Plaintiff into his vehicle. Plaintiff contends that Montalvo kicked her "with his feet, trying to get [her] to get up." Carcamo Dep. 95:9-10. Defendants allege that Montalvo told Plaintiff that he needed to move her, she consented, and she cooperated in the endeavor by holding onto him and pulling herself into the vehicle. Montalvo's Facts ¶ 14; Montalvo Dep. 112:7-16. But all the parties agree that when he saw that she was unable to stand, Montalvo picked Plaintiff up by the torso and placed her upper body through one rear passenger door onto the backseat of his vehicle, with her legs still resting on the ground, then walked to the other rear passenger door and pulled Plaintiff the rest of the way into the vehicle. Pl.'s Facts ¶ 19.[1] Montalvo then drove Plaintiff across the vega and along a dirt road to meet the Emergency Medical Technicians ("EMTs") on a paved road at a more accessible location. *Id.*; Montalvo's Objections to Pl.'s Resp. to Montalvo's Facts ¶ 18. From there the EMTs took Plaintiff to the hospital. *Id.*; Pl.'s Facts ¶ 19.

Plaintiff was hospitalized from February 2, 2008, until February 27, 2008, for her injuries. *Id.* ¶ 22. She has undergone three surgeries and has ongoing medical problems, including an inability to have sex, an inability to stand for long periods of time, and little bladder

---

[1] It appears that Montalvo's response to Plaintiff's proposed facts is misnumbered starting in this area, so that response ¶ 18 actually corresponds to proposed fact ¶ 19, response ¶ 19 to fact ¶ 20, and so on. Based on the content of the responses, the Court considers the misnumbered response paragraphs together with the fact paragraphs to which they appear to correspond, and treats the facts as undisputed where appropriate.

control. *Id.* ¶ 23.

Border Patrol Agents drive on the vega in order to pursue suspected aliens, or deter aliens from seeking to enter because of the Border Patrol Agents' mere presence.  Kevin McCrary Deposition ("McCrary Deposition") 40:18-41:1, ECF No. 65-5.  Driving on the vega does present some risks, and Border Patrol Agents are given instruction on some of the risks, but are not told not to drive there. *See id.* 30:20-31:2; Montalvo Dep. 30:16-24, 38:21-24.  The concerns include dangers to possible immigrants in the area, Montalvo Dep. 79:6-12, dangers to the agents from gunfire coming from across the border, *id.* 38:21-24, and potential damage to the agents' vehicles from the rough terrain.  McCrary Dep. 31:3-9.  However, despite the dangers, Border Patrol Agents commonly drive on the vega as part of their regular duties. *Id.* 31:12-24.

Plaintiff filed this action on October 9, 2009, asserting four causes of action against twenty unknown Border Patrol Agents and against the government directly.  Compl., ECF No. 1.  She subsequently amended her Complaint on July 30, 2010, substituting Montalvo for one of the unknown agents.  First Am. Compl., ECF No. 18.  At present, Plaintiff asserts a cause of action against Montalvo and nineteen other unknown Border Patrol Agents under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for violations of her Fourth and Fifth Amendment rights. *Id.* ¶¶ 19-24.  She asserts one cause of action against the government under the Federal Tort Claims Act ("FTCA") for assault and one for battery. *Id.* ¶¶ 25-34.  Finally, she appears to assert a cause of negligence against Montalvo under state law and against the government under the FTCA. *Id.* ¶¶ 35-38.

## II.    DISCUSSION

### A.    Standard

Summary judgment is required "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam)).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996).

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323; *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996).  To show the existence of a genuine dispute, the nonmoving party must support its position with citations to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials[,]" or show "that the materials cited by the movant do not establish the absence . . . of a genuine dispute, or that [the moving party] cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c).  The court resolves factual controversies in favor of the nonmoving party; however, factual controversies require more than "conclusory allegations," "unsubstantiated assertions," or  "a 'scintilla' of evidence."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  Further, when reviewing the evidence, the court must draw all reasonable inferences in favor of the nonmoving party, and may not make

6

credibility determinations or weigh evidence.  *Man Roland, Inc. v. Kreitz Motor Express, Inc.*,

438 F.3d 476, 478-79 (5th Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530

U.S. 133, 150 (2000)).  Thus, the ultimate inquiry in a summary judgment motion is "whether

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

>   **B.   Analysis**

>   >   **1.   Montalvo's Motion**

Montalvo has moved for summary judgment on Plaintiff's claims against him on four

grounds.  First, he argues he is qualifiedly immune to the *Bivens* claim that he violated Plaintiff's

rights under the Fourth and Fifth Amendments.  Montalvo's Mot. 2-8.  Second, he contends that

the Fifth Amendment claim should be analyzed under the same framework as the Fourth

Amendment claim, and should be dismissed for the same reasons he is qualifiedly immune to the

Fourth Amendment claim.  *Id.* at 9.  Third, he argues that any claims Plaintiff might have against

him are barred by Texas's unlawful acts rule.  *Id.*  Finally, he argues that the FTCA shields him

from any state law tort claims, such as Plaintiff's negligence claim, based on actions taken in the

scope of his employment,.  *Id.* at 12-13.

Because the resolution of Montalvo's second argument affects the analysis of his

qualified immunity defense, the Court proceeds by first addressing Montalvo's second argument,

then by addressing his remaining arguments in turn.

>   >   **a.   Plaintiff's Fifth Amendment claim should receive a Fourth
>   >   Amendment analysis**

Montalvo argues that Plaintiff's *Bivens* claim for violations of the Due Process Clause of

the Fifth Amendment are based on the same allegations as her claim for violations of the Fourth

Amendment, and thus the Fifth Amendment claim should be reviewed using the same framework as her Fourth Amendment claim. *Id.* at 9. Plaintiff did not respond to this argument.

Out of a reluctance to expand the scope of substantive due process, the Supreme Court has instructed that "'where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)). With specific regard for the Fourth Amendment, "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original). However, this rule only concerns how a claim is analyzed, and does not indicate that a claim for excessive force cannot arise under the Fifth Amendment. *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997). Moreover, "[s]ubstantive due process analysis is . . . inappropriate . . . only if [the] claim is 'covered by' the Fourth Amendment." *Lewis*, 523 U.S. at 843. Thus, if a Fifth Amendment claim is not covered by the Fourth Amendment, it should receive an independent substantive due process analysis. *Petta v. Rivera*, 143 F.3d 895, 901 (5th Cir. 1998) ("a plaintiff whose claim is not susceptible to proper analysis with reference to a specific constitutional right may still state a claim under § 1983 for a violation of his or her Fourteenth Amendment substantive due process right, and have the claim judged by the constitutional standard which governs that right"); *Carhart v. Gonzales*, 413 F.3d 791, 795 n.2 (8th Cir. 2005) (noting that the Due Process Clauses of the Fifth and Fourteenth Amendments "proscribe virtually identical governmental conduct"),

*rev'd on other grounds*, 550 U.S. 124 (2007).  A claim is only covered under the Fourth

Amendment if it is based on a seizure, which only occurs "when there is a governmental

termination of freedom of movement through means intentionally applied."  *Scott v. Harris*, 550

U.S. 372, 381 (2007)  (quotation, alterations, and ellipsis omitted).

Montalvo is correct that to the extent that Plaintiff alleges a violation of the Fifth

Amendment's substantive due process protections based on Montalvo's intentional use of his

vehicle to run over Plaintiff and his intentional desire to harm her by throwing her in his vehicle

and driving her to a distant location before calling an ambulance, the analysis of that claim is

identical to the analysis of her Fourth Amendment claim based on the same conduct.  *See*

*Graham*, 490 U.S. at 395.  So, Montalvo's argument for summary judgment on this aspect of

Plaintiff's Fifth Amendment claim succeeds or fails together with his argument with regard to

Plaintiff's Fourth Amendment claim.

However, Plaintiff's Complaint is not limited to allegations of intentional and malicious

conduct, so Montalvo is not correct that Plaintiff's entire Fifth Amendment claim rises or falls

with her Fourth Amendment claim.  Plaintiff alleges that Defendants "intentionally, maliciously,

and *recklessly* violated Plaintiff Carcamo-Lopez's rights under due process guaranteed by the

Fifth Amendment of the U.S. Constitution and her Fourth Amendment right to be free from

unreasonable search & seizure."  First Am. Compl. ¶ 21 (emphasis added).  This aspect of

Plaintiff's Fifth Amendment claim is not covered by the Fourth Amendment because, as set forth

above, the Fourth Amendment requires "means *intentionally* applied."  *See Scott*, 550 U.S. at

381.  Thus, Plaintiff's Fifth Amendment claim based on a recklessness theory must be analyzed

independently, using substantive due process principles.  *See Lewis*, 523 U.S. at 849 (citing

*Daniels v. Williams*, 474 U.S. 327, 334 n.3 (1986)) (noting that some reckless or grossly

negligent conduct could be "egregious enough to state a claim under substantive due process").

Accordingly, the Court holds that Plaintiff's Fifth Amendment claim based on allegations of intentional conduct should be analyzed using a Fourth Amendment framework, but her Fifth Amendment claim based on allegations of recklessness should be analyzed using traditional substantive due process principles.

### b.    Qualified immunity

Montalvo contends he is qualifiedly immune to Plaintiff's Fourth and Fifth Amendment claims because there is no evidence that he acted intentionally when he ran Plaintiff over in his vehicle, Montalvo's Mot. 4-6, and because driving her to a different location to receive medical treatment did not violate a clearly established right. *Id.* at 6-8. Plaintiff responds that circumstantial evidence is sufficient to create a reasonable inference that Montalvo acted intentionally in running her over. Pl.'s Opp'n to Montalvo's Mot. for Summary J. ("Pl.'s Resp. to Montalvo's Mot.") 9-10, ECF No. 83. Plaintiff also argues that it was objectively unreasonable for Montalvo to drive Plaintiff to a different location, thereby delaying her medical attention. *Id.* at 9.

Qualified immunity protects officials from suits "for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This defense is available to federal officials in *Bivens* actions, and is identical to the defense available to defendants in § 1983 actions. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). The precise procedure for evaluating qualified immunity is unclear, with some cases requiring the government official seeking qualified immunity to first show an entitlement to the defense by showing that the alleged violation occurred in his official

10

capacity and was within the scope of his discretionary authority, while other cases do not impose

such a requirement.  *Compare Cronen v. Tex. Dep't of Human Servs.*, 977 F.2d 934, 939 (5th

Cir. 1992), *with Michalik v. Hermann*, 422 F.3d 252, 257 (5th Cir. 2005).  Whatever the

requirement on the defendant for a valid invocation, once invoked the plaintiff has the burden of

showing the defense does not apply, and must prove two elements to discharge that burden: "(1)

that the official violated a statutory or constitutional right, and (2) that the right was 'clearly

established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, --- U.S. ----, 131 S.Ct.

2074, 2080 (2011) (quoting *Harlow*, 457 U.S. at 818).  "[C]onduct violates clearly established

law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear'

that every 'reasonable official would have understood that what he is doing violates that right.'"

*Id.* at 2084 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alterations omitted).  In

other words, "the qualified immunity standard 'gives ample room for mistaken judgments' by

protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Mangieri*

*v. Clifton*, 29 F.3d 1012, 1017 (5th Cir. 1994) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229

(1991)).  Courts "have discretion to decide which of the two prongs of qualified-immunity

analysis to tackle first."  *al-Kidd*, 131 S. Ct at 2080 (citing *Pearson*, 555 U.S. at 236).

Here, Montalvo raised the defense of qualified immunity in his motion, but did not prove

his entitlement to the defense by showing the alleged violations occurred in his official capacity

and were within the scope of his discretionary authority.  *See* Montalvo's Mot. 3.  However,

because it appears likely that Montalvo could make the required showing, and because Plaintiff

has not contested the issue, the Court proceeds directly to determine whether Plaintiff has

discharged her burden of showing the defense does not apply.  The Court begins with the first

prong, whether Plaintiff has at least created a disputed issue of material fact about whether

11

Montalvo violated her constitutional rights.  *See Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 490 (5th Cir. 2001).  Plaintiff has alleged Montalvo used excessive force when he ran her over and then "picked her up, threw her into his vehicle, and drove her to another location before calling an ambulance, despite knowing she was seriously injured."  First Am. Compl. ¶¶ 15-16.

"'A Fourth Amendment seizure occurs when there is a governmental termination of freedom of movement through means intentionally applied.'"  *Scott*, 550 U.S. at 381 (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–597 (1989)) (alterations and ellipsis omitted).  Intentional conduct is an essential requirement for a seizure, as "'the word 'seizure' . . . can hardly be applied to an unknowing act.'"  *Laughlin v. Olszewski*, 102 F.3d 190, 193 (5th Cir. 1996) (quoting *Brower*, 489 U.S. at 596).  "[T]he Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct."  *Brower*, 489 U.S. at 596 (quoting *Byars v. United States*, 273 U.S. 28, 33 (1927)).

Montalvo first argues that there was no seizure here, so that the Fourth Amendment is not applicable.  The Court agrees.  Plaintiff has failed to rebut the assertion of qualified immunity by showing a constitutional violation occurred, because she has not submitted sufficient evidence that a seizure took place.  Plaintiff does not point to any direct evidence that Montalvo's running over Plaintiff was intentional, but instead argues that circumstantial evidence gives rise to a reasonable inference that Montalvo saw her and intentionally ran her over.  Plaintiff is correct that all reasonable inferences should be drawn in her favor, *see Man Roland*, 438 F.3d at 478-79 (citation omitted), but in this case the Court does not believe that an inference of intentionality is reasonable.

According to Plaintiff's version of the facts, she was attempting to cross the border at night, wearing dark clothes, but in an area well illuminated by lights from a nearby bridge, when

12

Montalvo turned his truck and pointed his headlights in her direction.  At that point she crouched down to the ground in a bare area free of brush, where she waited for seven to ten minutes, when Montalvo suddenly charged his vehicle toward her.  She was able to avoid the front tires of the vehicle, but was run over by the back tires.  After running her over, Montalvo parked, got out and walked back to where she was lying, and asked her, "What are you doing there, ma'am?"  Then he kicked her to try to get her to stand up, dragged her into his vehicle, and drove her to get medical attention.

Plaintiff has not submitted any direct evidence of intentionality and the circumstantial evidence she has submitted does not support a reasonable inference that Montalvo intended to run her over.  If Montalvo wished to harm Plaintiff, he would likely have done so immediately upon seeing her, not after a seven minute standoff.  Indeed, the notion of a "standoff" strikes the Court as all the more unlikely given the relative positioning of the two parties involved, with Montalvo driving a vehicle and Plaintiff crouching on the ground.  This unequal positioning counsels against a seven minute stalemate.  Additionally, the fact that Plaintiff was only run over by the vehicle's back tires, and not the front, indicates an accidental or inadvertent encounter; if Montalvo had sped up in order to run Plaintiff over, the Court cannot see how he could have done so only with his back tires.  Furthermore, Montalvo's words upon finding Plaintiff behind his vehicle do not sound like the statement of a person who has just intentionally run someone over.  Even crediting Plaintiff's allegation that Montalvo kicked her to get her into his vehicle to drive her to get medical treatment, one would imagine someone so cruel as to intentionally run over another human being with his vehicle to provide the victim no help at all, or at the very least subject her to harsher language and much rougher handling.  Finally, Plaintiff has not presented any argument, much less evidence, that would indicate to the Court what might have

13

motivated Montalvo to commit an assault of this type.  Proof or at least a speculation as to possible explanations for such behavior would have helped persuade the Court that an inference of intentionality was reasonable, and its absence helps persuade it that the inference is not reasonable.

In short, logic and common sense dictate against finding the presence of malevolent behavior necessary for intentionality.  The Court cannot say it would be reasonable to infer from the evidence at this stage, disputed or undisputed, that Montalvo intentionally ran over Plaintiff with his vehicle.  Without evidence of an intentional termination of Plaintiff's freedom of movement, Plaintiff cannot show a seizure occurred, *see Scott*, 550 U.S. at 381 (citation omitted), and without a seizure, Plaintiff's cannot make out a claim of excessive force under the Fourth Amendment.  Therefore, the Court grants Montalvo summary judgment on that aspect of Plaintiff's *Bivens* claim.  *See id.*  And because Plaintiff's Fifth Amendment claim based on an intentional theory is reviewed using the same analysis, *see Graham*, 490 U.S. at 395, the Court also grants Montalvo summary judgment on that aspect of Plaintiff's Fifth Amendment claim.

The Court turns next to Montalvo's second argument, which is based on the second prong of qualified immunity.  Montalvo contends that his actions in driving Plaintiff to another location to receive medical care instead of leaving her at the site of the accident were objectively reasonable, and so cannot constitute a violation of a clearly established right.  Montalvo's Mot. 6-8.  Plaintiff responds that it was objectively unreasonable for Montalvo to run over Plaintiff, then kick her, throw her into his truck, and drive her to get medical treatment.  Because the Court has already found the Fourth Amendment does not apply because there was no seizure, it examines these arguments only as they apply to Plaintiff's Fifth Amendment claim based on a theory of recklessness.

14

To constitute a violation of a person's substantive due process rights, physically injurious governmental actions must "'shock[] the conscience'" or "'violate[] the decencies of civilized conduct.'"  *See Lewis*, 523 U.S. at 846 (quoting *Rochin v. California*, 342 U.S. 165, 172-73 (1952)).  "[O]nly the most egregious official conduct" rises to the level of being actionable under substantive due process.  *Id.*  Due process is not meant to mirror traditional tort law, so negligently inflicted harm is "categorically beneath the threshold of constitutional due process." *Id.* at 849; *McClendon v. City of Columbia*, 305 F.3d 314, 325 (5th Cir. 2002) (en banc) ("in order to state a viable substantive due process claim the plaintiff must demonstrate that the state official acted with culpability beyond mere negligence").  Instead, intentional actions are the type of conduct most likely to violate substantive due process principles.  *Lewis*, 523 U.S. at 849. Whether grossly negligent or reckless conduct can rise to the requisite conscience-shocking level "is a matter for closer calls."  *Id.* at 849.  In making such calls, prior cases are of only limited utility, because conduct "that shocks in one environment may not be so patently egregious in another, and [the Supreme Court's] concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."  *See id.* at 850.

Here, the Court has no difficulty concluding that Montalvo's actions do not show a violation of clearly established Fifth Amendment law.  Even assuming Montalvo was reckless in driving on the vega, or that he was reckless in deciding to drive Plaintiff to another location for medical attention and in trying to get her into his vehicle, the Supreme Court's decision in *Lewis* indicates that finding a violation based on such a level of culpability would at the very least be a "close[] call."  *Id.* at 849.  The lack of clarity, especially in light of Plaintiff's failure to point to any case with analogous facts that would have made the issue any more clear, makes Montalvo's

15

alleged recklessness incompatible with a finding that he violated a right whose contours were clear. This is sufficient to resolve the issue of qualified immunity in Montalvo's favor. *See al-Kidd*, 131 S.Ct. at 2084.

But in addition, the Supreme Court has explicitly foreclosed a finding of substantive due process violations based on reckless conduct of this type. "[W]hen unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.'" *Lewis*, 523 U.S. at 853 (quoting *Daniels*, 474 U.S. at 332). Because reckless conduct in unforeseen circumstances such as those Montalvo faced cannot qualify as a violation of an individual's Fifth Amendment substantive due process rights, much less a violation of clearly established rights, Montalvo is entitled to qualified immunity on Plaintiff's Fifth Amendment claim based on a recklessness theory as well.

Accordingly, because Plaintiff has not shown that Montalvo's actions violated her Fourth Amendment rights, or that they violated her clearly established Fifth Amendment rights, the Court grants Montalvo summary judgment on Plaintiff's *Bivens* claim.

### c.    Unlawful acts rule

Because the Court grants Montalvo summary judgment on all of Plaintiff's claims on other grounds, it does not reach Montalvo's argument under the unlawful acts rule.

### d.    Immunity to negligence claim

Montalvo argues that suit against the United States under the FTCA is the exclusive remedy for torts committed by federal employees within the course and scope of their employment, so that Plaintiff's tort claims against him should be dismissed. Montalvo's Mot. 12-13. Though Plaintiff's argument in response is unclear, she appears to argue that there are

16

fact questions regarding whether Montalvo was acting in the course and scope of his employment because the facts could indicate that Montalvo's actions that injured Plaintiff were reckless.  Pl.'s Resp. to Montalvo's Mot. 14-15.

The FTCA is a limited waiver of sovereign immunity by the federal government that allows it to be sued "for the negligent or wrongful acts of its employees 'where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'"  *Spotts v. United States*, 613 F.3d 559, 566 (5th Cir. 2010) (quoting 28 U.S.C. § 1346(b)(1)).  The remedy against the government under the FTCA for personal injuries "arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee." 28 U.S.C. § 2679(b).  Suits based on the same subject matter against the employee whose tort created the liability for the government are "precluded," except those alleging violations of the United State Constitution or of a federal statute that otherwise authorizes such suits.  *Id.*  Once the government certifies that the employee's actions allegedly creating the liability were within the scope of his employment, the tort claim "shall be deemed an action against the United States under the [FTCA] and the United States shall be substituted as the party defendant."  *Id.* § 2679(d)(1).  The end result is that federal employees enjoy immunity from state tort suits for conduct in the scope of their official duties.  *See Houston Cmty. Hosp. v. Blue Cross & Blue Shield of Tex., Inc.*, 481 F.3d 265, 269 (5th Cir. 2007).

The applicable law for determining whether a federal employee was acting in the scope of his employment for FTCA purposes is the law of the state where the wrongful action

occurred, in this case, Texas. *See Bodin v. Vagshenian*,  462 F.3d 481, 484 (5th Cir. 2006) (citing *Williams v. United States*, 350 U.S. 857 (1955); *Rodriguez v. Sarabyn*, 129 F.3d 760, 766 (5th Cir. 1997)).  In Texas, "'an employee's conduct is considered to fall within the scope of his employment if his actions were (1) within the general authority given him; (2) in furtherance of the employer's business; and (3) for the accomplishment of the object for which the employee was employed.'" *Id.* (citing *Counts v. Guevara*, 328 F.3d 212, 214 (5th Cir. 2003)); *see also Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002) (setting out an identical standard).  To be within the scope of employment, an action also must be "'of the same general nature as that authorized or incidental to the conduct authorized.'" *Minyard*, 80 S.W.3d at 577 (quoting *Smith v. M Sys. Food Stores, Inc.*, 297 S.W.2d 112, 114 (Tex. 1957)).  Even an intentional tort may still be within the scope of employment so long as "the act, although not specifically authorized by the employer, is closely connected with the servant's authorized duties." *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 618 (Tex. 1999).  The Texas Supreme Court has illustrated the concept of a close connection in its statement that "where a security guard uses more force than is necessary in protecting the employer's property," the tort is closely connected to the guard's authorized duties. *Medina v. Herrera*, 927 S.W.2d 597, 601 (Tex. 1996) (citing *Tex. & Pac. Ry. Co. v. Hagenloh*, 247 S.W.2d 236, 239 (Tex. 1952)).

Here, the negligence claim is based on actions that plainly fall within the scope of Montalvo's employment.  Regarding the first element, authority of the employee, Plaintiff does not dispute that the United States Border Patrol's purpose is to prevent illegal immigration, and that to carry out that mission Montalvo had the authority as a Border Patrol Agent to pursue and detain illegal aliens.  Montalvo's Facts ¶¶ 1-2; Pl.'s Resp. to Montalvo's Facts ¶¶ 1-2. Regarding the second element, furtherance of the employer's business, Plaintiff does not dispute

18

that Montalvo was driving on the vega on the night in question in order to detain illegal immigrants, in furtherance of his employer's mission.  Montalvo's Facts ¶ 2; Pl.'s Resp. to Montalvo's Facts ¶ 2.  Regarding the third and final element, accomplishment of the employee's employment function, the undisputed evidence leads the Court to conclude that Montalvo's actions were taken for the accomplishment of his duties.  For the reasons set forth above in the discussion of Plaintiff's *Bivens* claim, there is no evidence that Montalvo was acting intentionally, so at most he could have been acting recklessly.  Even assuming he was reckless, though, that does not change the fact that his purpose in driving on the vega, and specifically his purpose in turning when he ran over Plaintiff, was to patrol for illegal aliens.  Contrary to Plaintiff's apparent argument, which cites to no Texas authority for the proposition, the Court has discovered no Texas cases holding that reckless actions are per se beyond the scope of employment.  Indeed, given that the Texas Supreme Court has held that intentional torts may be within the scope of employment, Plaintiff's argument is difficult to credit.  *See Bruce*, 998 S.W.2d at 618; *Medina*, 927 S.W.2d at 601 (citing *Hagenloh*, 247 S.W.2d at 239).

Even if there were some doubt about this, Plaintiff's own allegations in the Complaint put the issue to rest.  In paragraph eight of the Complaint, Plaintiff alleged, "In committing the acts alleged in this complaint, Defendants DOES 1 through 20, inclusive, and Montalvo were acting within the course and scope of their employment and were acting on behalf of Defendant United States of America in their capacity as Customs and Border Protection Agents. Additionally, they were acting as discussed in *Bivens*."  First Am. Compl. ¶ 8.  This section was incorporated by reference within the negligence cause of action section.  First Am. Compl. ¶ 35 ("Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 34 of this complaint.").  Thus, for the purposes of the negligence cause of action, Plaintiff has alleged that

Montalvo was acting in his official capacity.  Such an allegation in the Complaint constitutes a judicial admission, and is binding upon Plaintiff for the rest of the case.  *See Martinez v. Bally's La., Inc.*, 244 F.3d 474, 476 (5th Cir. 2001); *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand,* 322 F.3d 147, 167 (2d Cir. 2003) ("the allegations in the Second Amended Complaint are 'judicial admissions' by which [the plaintiff] was bound throughout the course of the proceeding.'") (alteration, quotation, and citation omitted); *Romine v. Acxiom Corp.*, 296 F.3d 701, 706 (8th Cir. 2002) ("While notice pleading does not demand that a complaint expound the facts, a plaintiff who does so is bound by such exposition.") (alteration, citation, and quotation omitted).  This prevents Plaintiff from claiming that a factual dispute exists concerning whether Montalvo was acting in the scope of his employment.

Because the undisputed evidence and Plaintiff's own allegations in the Complaint show that Montalvo's actions were within the scope of his employment, and actions against individual employees are precluded by the FTCA, the Court finds Plaintiff's negligence claim against Montalvo is precluded and grants summary judgment for Montalvo on that claim.

### 2.     Government's Motion

The government has moved for dismissal or, in the alternative, for summary judgment, based on four grounds.  First, the government contends this Court lacks jurisdiction over Plaintiff's claims based on Montalvo's decision to move Plaintiff from the place of the incident to an area more accessible to emergency medical personnel, because those actions fall within the discretionary function exception from the FTCA's waiver of sovereign immunity.[2]  Gov't Mot.

---

[2]     The government appears to treat Plaintiff's claims against it as being pleaded in the alternative, based either on Montalvo's conduct in driving his vehicle or on his actions after discovering he had run over Plaintiff.  Therefore, in ruling upon the Government's Motion the Court proceeds in the same fashion.  *See* Fed. R. Civ. P. 56(a) (allowing for summary judgment on parts of claims or defenses).

6-10.  Second, the government argues Plaintiff's Complaint should be dismissed because an applicable Texas statute only subjects operators of emergency vehicles in emergencies to liability if the use was reckless, and that Plaintiff cannot show Montalvo was reckless in driving on the vega.  *Id.* at 10-14.  Third, it argues that Plaintiff's assault and battery claims should be dismissed because Plaintiff cannot show Montalvo's actions were intentional.  *Id.* at 15-16. Finally, it argues that all of Plaintiff's claims should be dismissed because they are barred by Texas's unlawful acts rule.  *Id.* at 16-19.  Because the Court considers the government's arguments in light of the summary judgment evidence the government submitted, and because Plaintiff had an opportunity to submit summary judgment evidence of its own, the Court treats the Government's Motion as one for summary judgment.  See Fed. R. Civ. P. 12(d).  The Court proceeds by examining each of the government's arguments in turn.

### a.      Discretionary function exception

The government argues that Montalvo's decision to move Plaintiff to a more accessible location despite her injuries, instead of waiting for medical personnel to arrive at the site of the accident, was a decision protected by the FTCA's discretionary function exception.  Gov't's Mot. 6-10.  Plaintiff responds that Montalvo's actions were controlled by Border Patrol policy, and that regardless the discretionary function exception was not created to protect this type of action.  Pl.'s Opp'n to Def. United States of America's Mot. to Dismiss, or, in the Alternative, Mot. for Summ. J. ("Plaintiff's Response to Government's Motion") 7-11, ECF No. 84.

The FTCA is a limited waiver of sovereign immunity by the federal government that allows it to be sued "for the negligent or wrongful acts of its employees 'where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'"  *Spotts*, 613 F.3d at 566 (quoting 28 U.S.C. § 1346(b)(1)).

However, through an exception from this waiver known as the discretionary function exception the government retains sovereign immunity to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

To determine whether the discretionary function exception applies, courts apply a two-step inquiry. *Spotts*, 613 F.3d at 567 (citing *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991)). The first step is to determine whether the claim is based on acts that "'involve an element of judgment or choice.'" *Id.* (quoting *Gaubert*, 499 U.S. at 322). In this inquiry, what matters is the nature of the acts performed, not the status of the employee performing them. *Id.* (citing *Gaubert*, 499 U.S. at 322). So long as the statute, regulation, or policy at issue leaves the employee some freedom to choose when and how to take action, the employee "is not bound to act in a particular manner and the exercise of [his] authority is discretionary." *See id.* (citing *Gaubert*, 499 U.S. at 329).

If a claim is based on actions involving judgment or choice, the next step is for the court to determine whether the "'judgment is of the kind that the discretionary function exception was designed to shield.'" *Id.* at 568 (quoting *Gaubert*, 499 U.S. at 322-23). This prong is designed to ensure that the protected actions are based on considerations of public policy, to effectuate the exception's purpose of preventing "'judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Id.* (quoting *Gaubert*, 499 U.S. at 323). "In this regard, 'if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which

led to the promulgation of the regulations.'" *Id.* (quoting *Gaubert*, 499 U.S. at 324).  What

matters is not whether some analysis of policy choices was made before taking the specific

actions at issue, merely whether the actions are "susceptible to policy analysis."  *Freeman v.*

*United States*, 556 F.3d 326, 337 (5th Cir. 2009) (quoting *Gaubert*, 499 U.S. at 325).  However,

not all discretionary acts by government employees are covered by the discretionary function

exception; for example, while driving a government vehicle involves "the constant exercise of

discretion, the official's decisions in exercising that discretion can hardly be said to be grounded

in regulatory policy," and so is not the kind of discretion the exception was designed to shield.

*Gaubert*, 499 U.S. at 325 n.7.

Beginning at the first step of the *Gaubert* test, the Court finds that the decision over

whether to move Plaintiff to another location, and what means to use, involved an element of

judgment or choice.  The only evidence that parties have submitted on the issue consists of a

statement of Border Patrol policy and a declaration by Assistant Chief Patrol Agent Oscar

Benavides ("Benavides").  The relevant policy states that "Border Patrol Agents who encounter

individuals who are injured are required to take immediate action to obtain medical attention for

the injured party."  Gov't Mot. 8.  Benavides stated that trainees are given instruction at the

Border Patrol Training Academy on "basic First-Aid/CPR" and "the basics of checking the scene

for safety and assessing the individual in an attempt to identify life-threatening and non life-

threatening conditions."  Benavides Decl. ¶ 4, ECF No. 66-20.  However, according to

Benavides, "that training does not rise to a mandatory directive.  Thus, the decisions on how to

conduct a rescue are left to the discretion of the Border Patrol Agents."  *Id.*

This record indicates that while Border Patrol Agents are instructed in the general

manner and methods with which to provide immediate medical attention and arrange for

23

professional medical care, they are not obligated to take any particular action in response to a given factual scenario. The training provided at the Border Patrol Training Academy does not "constrain[] the decision-making ability" of Border Patrol Agents, *Ashford v. United States*, 511 F.3d 501, 505 (5th Cir. 2007), but merely gives them medical information why moving certain injured individuals is ill advised. Because the training and Border Patrol policy allowed Montalvo to use his judgment when deciding how to secure medical care for Plaintiff and no other authority constrained that judgment, Montalvo was exercising discretion, and the first part of the *Gaubert* test is satisfied. *See Spotts*, 613 F.3d at 567 (citing *Gaubert*, 499 U.S. at 329).

The Court turns now to the second aspect of the *Gaubert* test, whether the discretion Montalvo exercised was the kind the statute was designed to shield. The Court acknowledges at the outset that the discretionary function exception protects the exercise of discretion without regard to the status of the employee exercising it, *see Spotts*, 613 F.3d at 567, and that there is a presumption that an employee exercising discretion under a policy is doing so in consideration of the same concerns that underlie the policy. *Id.* at 568 (citing *Gaubert*, 499 U.S. at 324). Yet, despite these and other principles provided by the Supreme Court in *Gaubert*, or perhaps because of them, the application of the discretionary function exception remains remarkably unclear. *See* 14 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3658.1, at 639 (3d ed. 1998) ("it is unclear exactly what falls within the scope of this provision, despite an immense amount of precedent that has developed on the subject"). In light of this lack of clarity, the Court is especially mindful of the Fifth Circuit's instruction to act cautiously when making a determination that a decision is protected by the exception. As the Fifth Circuit put it,

[A]s virtually every act of a government employee involves at least a modicum of

choice, we must exercise restraint when applying the discretionary function
exception.  If courts were not to exercise restraint, the government would be
insulated "from nearly all tort liability," thereby frustrating the very purposes that
motivated enactment of the FTCA - a classic example of the exception
swallowing the rule.

*Johnson v. Sawyer*, 980 F.2d 1490, 1502 (5th Cir. 1992), *vacated on other grounds*, 47 F.3d 716
(5th Cir. 1995) (quoting *Collins v. United States*., 783 F.2d 1225, 1233 (5th Cir. 1986)).

Similarly, the Court notes that even though the Supreme Court has held that a formalistic

distinction between planning activities and operations activities may not be used to establish a

line between per se protected and unprotected activities, the distinction does have some

continuing vitality.  *See Denham v. United States*, 834 F.2d 518, 520 (5th Cir. 1987) ("Once the

government does undertake to supply a service, then it must be held responsible for negligent

acts in supplying the service."); *LaRue v. Nat'l Park Serv. of Dep't of Interior*, No. B–09–139,

2011 WL 1828037, at *7 n.8 (S.D. Tex. May 12, 2011) ("The Fifth Circuit has at least once

graced *Denham* with an imprimatur of continued vitality after *Gaubert*.") (citing *Theriot v.*

*United States*, 245 F.3d 388, 396 (5th Cir. 1998)); *see also Wysinger v. United States*, 784 F.2d

1252, 1253 (5th Cir. 1986) ("[O]nce the government has made a decision to act the government

is responsible for acts negligently carried out even though discretionary decisions are constantly

made as to how those acts are carried out.").  The alternative, protection under the exception of

both the decision to take an action and the negligent implementation of that decision, "'would

essentially allow the Government to administratively immunize itself from tort liability under

applicable state law as a matter of policy.'"  *In re Katrina Canal Breaches Consol. Litig.*, 647 F.

Supp. 2d 644, 706 (E.D. La. 2009) (quoting *Marlys Bear Med. v. U.S. ex rel. Sec'y of Dep't of*

*the Interior*, 241 F.3d 1208, 1215 (9th Cir. 2001)); *see also Morales v. United States*, 961 F.

Supp. 633, 636 (S.D.N.Y. 1997) ("Indeed, to expand the exception to encompass *any*

government act or decision that simply involved the exercise of discretion would entirely

eviscerate, and contradict, the Government's waiver of sovereign immunity under the FTCA.")
(emphasis in original).

With the restraint urged by the Fifth Circuit and mindful that its application of the
exception should not allow the exception from the FTCA to swallow the FTCA's operation as a
broad waiver of sovereign immunity, the Court concludes that the discretion Montalvo exercised
was not grounded in the type of governmental policy the statute seeks to insulate from judicial
review.  The only policy considerations the government refers to as being relevant to Montalvo's
decision were staffing, funding, and minimizing government intrusion.  Gov't Mot. 9.
Regarding the first, the Court does not see how the government can credibly maintain that
Montalvo's decision over whether to leave Plaintiff in place while seeking help or drive her to
another location implicates staffing considerations of any sort.  Montalvo had no supervisory
authority, and thus no ability to making staffing decisions.  At most, the only staff person whose
time he had discretion to allocate was himself, and there is no suggestion that he was weighing
his need to return to his duties against the time commitment of driving Plaintiff to another
location.  Given that he does not appear to have returned to his duties at all on the night in
question, and that it seems likely that he would not have simply abandoned Plaintiff if he had
decided not to drive her to another location, this policy consideration is, to put it charitably,
misplaced.

Similarly, regarding the funding concern, Montalvo was not making any outlays of funds,
nor could his decision have conceivably changed the budgetary picture for the Border Patrol in
the slightest.  In addition, as the D.C. Circuit has found, budgetary constraints underlie virtually
all government activity.  *Cope v. Scott*, 45 F.3d 445, 448-49 (D.C. Cir. 1995).  So, even if
funding were a possible concern here somehow, such a policy consideration would carry little

weight.  *See id.*

Finally, the governmental intrusion concern is simply inapplicable here.  The phrase first arose in a case involving an alleged failure by the National Park Service ("NPS") to quickly mount a search and rescue operation in a national park at the first suggestion that a hiker was in distress.  *See Johnson v. U.S. Dep't of Interior*, 949 F.2d 332, 335 (10th Cir. 1991).  The Tenth Circuit held that the NPS's "decision if, when or how to rescue inherently involves the balancing of safety objectives against such practical considerations as staffing, funding and minimizing government intrusion."  The intrusion, in that context, referred to hikers' desire to experience the freedom and solitude of the wilderness, which would necessarily be thwarted if the NPS routinely mounted search and rescue patrols at the slightest hint of danger, as it would lead to unnecessary rescues in many instances.  *See id.* at 339.  As is plain, no such policy consideration could possibly apply to the facts here.  The decision over how to obtain medical care for Plaintiff in no way involved impinging upon anyone's desire for solitude.  Thus, this policy consideration, and the citation to *Johnson*, are irrelevant to this case.

In actuality, Montalvo's decision was not one "'susceptible to policy analysis,'" based upon the policy asserted here, *see Freeman*, 556 F.3d at 337 (quoting *Gaubert*, 499 U.S. at 325), but rather only susceptible to general safety considerations.  In this respect, Montalvo's decision may usefully be considered as one relating to the best method of delivering medical care, a balancing of the need for speed against the need for specific equipment.  The Border Patrol policy sets the broad policy that medical care should be delivered to suspected aliens, but this does not mean that any action an agent takes to obtain that medical care is protected from suit.  While the government surely has a policy interest in ensuring that individuals receive prompt, professional care, and it gives its employees the discretion to weigh competing alternatives with

27

regard to obtaining that care for others, this cannot mean that every choice between different methods of obtaining care is protected by the FTCA's discretionary function exception. Otherwise, the government could never be liable for medical negligence under the FTCA, which is not the case. *See Sigman v. United States*, 217 F.3d 785, 795 (9th Cir. 2000) (referring to "the now well-established principle that the discretionary function exception is intended to shield the government from liability for the exercise of governmental discretion, not to shield the government from claims of garden-variety medical malpractice"); *see also Guile v. United States*, 422 F.3d 221, 230-31 (5th Cir. 2005) (implicitly acknowledging that medical judgments are not protected under the discretionary function exception, but finding the principle inapplicable to the facts before the court).

Montalvo's discretion may also be profitably compared to that of a vehicle driver, whose discretion the Supreme Court found was not grounded in policy concerns and thus should not be protected under the discretionary function exception. *See Gaubert*, 499 U.S. at 325 n.7. While a driver of a vehicle certainly exercises discretion every second that he is on the road, that is not the type of discretion the FTCA exception seeks to protect. This is true even though one might accurately describe the driver's discretion as implicating economic efficiency concerns and safety considerations. "The need for expedition vs. the need for safety may well represent a policy choice, but the Government does not expect its drivers to make that choice on a case-by-case basis." *Gaubert*, 499 U.S. at 336 (Scalia, J., concurring) (internal citation omitted). In such circumstances, the discretion by the driver, like that by Montalvo here, is not grounded in social, economic, or political policy, but merely the execution of a safety policy chosen by higher level officials, albeit one requiring discretion to implement.

The case most factually similar to this one, and thus the comparison most persuasive to

the Court, involved a claim that emergency responders acted negligently in failing to stabilize

the spine of the victim before delivering treatment and trying to move her.  *See Fang v. United*

*States*, 140 F.3d 1238, 1240 (9th Cir. 1998).  There, the Ninth Circuit came to the same

conclusion as the Court does here, drawing a clear separation between discretionary decisions of

policy and those based on a lower level of unprotected discretion:

> No social, economic, or political policy is implicated in the decision whether to
> stabilize the spine of a person who may have suffered a head, neck, or back injury
> prior to treatment. This is simply an ordinary judgment made by EMTs in
> applying their training and expertise to an emergency situation.

*Fang*, 140 F.3d at 1243.

Like the Ninth Circuit, the Court finds the type of discretion Montalvo exercised was a simple

matter of whether he exercised due care in handling an injured person.  As with cases of

premises liability, this discretion involved here is of a quintessential tort variety, not one that

could give rise to second guessing of governmental economic, social, or political policy

decisions.  *See Gotha v. United States*, 115 F.3d 176, 181 (3d Cir. 1997) (describing a claim

against the Navy involving premises liability as "a mundane, administrative, garden-variety,

housekeeping problem that is about as far removed from the policies applicable to the Navy's

mission as it is possible to get"); *see also Sanchez v. Bellefeuille*, 855 F. Supp. 587, 593

(N.D.N.Y. 1994) (holding that the Border Patrol's decision on whether or not to take into

account relevant traffic safety considerations when designing a checkpoint related only to safety

of approaching motorists, not any public policy considerations).

The government cites to a Fifth Circuit opinion involving the discretionary function

exception in support of its position, but the Court does not find that decision controls the

outcome here.  In a per curiam decision in *Davis v. United States*, 597 F.3d 646 (5th Cir. 2009),

the Fifth Circuit held that a Navy helicopter rescue team's decision to attempt a rescue of a

woman during Hurricane Katrina using the type of equipment they had, rather than radioing to a

nearby helicopter to attempt the rescue with more suitable equipment, was protected by the

discretionary function exception.  597 F.3d at 650-51.  The Fifth Circuit's opinion is rather terse

and so does not assist much in the present analysis, but the case is in any event distinguishable.

In *Davis*, the Fifth Circuit found the rescue team had to decide "'when, where, and how to

allocate limited resources within the exigencies of an emergency,'" and to consider "[s]afety,

efficiency, timeliness, and allocations of resources."  The rescue team had to make these

determinations in the context of the historic storm and monumental scale of destruction and

breakdown of society that occurred in New Orleans.  They did not confront any issues of

medical judgment, only the choice of methods to effectuate the rescue, whether to use their own

equipment or to divert another helicopter from its mission to take over.

By contrast, here the incident was a fairly routine vehicle accident, of a type that likely

occurs with some regularity all over the country.  Montalvo had only one issue to consider,

namely, Plaintiff's health.  He did not have to weigh the allocation of scarce resources, nor was

he confronted with a broad emergency situation in which he needed to balance Plaintiff's needs

against those of countless others he needed to rescue, as was the case in *Davis*.  The decision to

transport Plaintiff or leave her in place was comparatively straightforward, involving only the

question of the best course of action from a medical perspective.  Given the vast differences

between the factual settings of *Davis* and the situation confronting Montalvo, and the

significantly different scale of considerations at play in each scenario, the Court does not believe

the *Davis* opinion requires an identical result here.

In sum, the Court agrees with the government that Montalvo's actions in deciding

whether to move Plaintiff to a more convenient location using the equipment available to him or

to leave her where she was and wait for medical personnel to reach them were discretionary.

However, in the Court's judgment, reinforced by precedent in factually similar cases,

Montalvo's actions were not of the type the discretionary function exception was designed to

protect.  Therefore, the Court denies the government summary judgment on this aspect of

Plaintiff's negligence claim.

### b.        Texas Transportation Code § 546.005(5)

The government next argues that Plaintiff's Complaint should be dismissed because a

Texas statute provides that where a law enforcement officer is using a law enforcement vehicle

in an emergency situation, the law enforcement officer cannot be liable for mere negligence, but

only for reckless actions.  Gov't Mot. 10-12.  The government contends there is no evidence

that Montalvo was operating his vehicle recklessly.  *Id.* at 13-14.  Plaintiff responds that the

Texas statute does not apply to the facts of this case, and even if it did, that there is a dispute of

material fact as to whether Montalvo's actions were reckless.  Pl.'s Resp. to Gov't Mot. 14-17.

The FTCA is a limited waiver of sovereign immunity by the federal government that

allows it to be sued "for the negligent or wrongful acts of its employees 'where the United

States, if a private person, would be liable to the claimant in accordance with the law of the place

where the act or omission occurred.'"  *Spotts*, 613 F.3d at 566 (quoting 28 U.S.C. § 1346(b)(1)).

The government is only liable under the FTCA to the same extent as a private person would be

under state law, so determinations of the government's liability through comparisons to official

liability under state law for state or municipal government employees' actions are inappropriate.

*United States v. Olson*, 546 U.S. 43, 45-46 (2005).  However, despite the statutory requirement

of comparison to private persons, the Fifth Circuit has held the government is still entitled to

invoke as a defense under the FTCA privileges available under state law for law enforcement

officers. *Villafranca v. United States*, 587 F.3d 257, 263-64 (5th Cir. 2009). The basis for this holding was the court's recognition that the alternative would mean federal law enforcement officers would only be able to use the same amount of force as a private person, which would be an absurd result. *Id.* at 264.

In Texas, where the events in question took place, "[u]nder emergency conditions, an emergency vehicle operator is entitled to various privileges." *City of Amarillo v. Martin*, 971 S.W.2d 426, 428 (Tex. 1998) (citing Tex. Transp. Code §§ 546.001-.005). The conditions that give rise to these privileges are: "(1) responding to an emergency call; (2) pursuing an actual or suspected violator of the law; (3) responding to but not returning from a fire alarm; (4) directing or diverting traffic for public safety purposes; or (5) conducting a police escort." Tex. Transp. Code § 546.002. Among the privileges an operator enjoys in an emergency are the authority to operate the vehicles in certain otherwise-illegal ways, as well as protection from suits based on mere negligence. Tex. Transp. Code §§ 546.001, .005; *Martin*, 971 S.W.2d at 430. "To recover damages resulting from the emergency operation of an emergency vehicle, a plaintiff must show that the operator has committed an act that the operator knew or should have known posed a high degree of risk of serious injury," meaning the plaintiff must show the operator was reckless. *Id.*

Here, the Court agrees with Plaintiff that the privileges afforded by the Texas Transportation Code, including the protection from suits based on negligence, do not apply. Assuming Montalvo's vehicle qualifies as an emergency vehicle, as seems likely, at the time that he ran over Plaintiff there was no emergency. The only emergency condition specified in the Texas Transportation Code that might apply is the pursuit of an actual or suspected violator of the law, Tex. Transp. Code § 546.002(2), and there are only three possible violators of the law whom Montalvo might have been pursuing: Plaintiff, and her two companions. Regarding

Plaintiff, the government argues that because pursuit of actual violators of the law is an emergency situation, and because Plaintiff actually violated immigration laws, then Montalvo's actions in running her over were in an emergency pursuit. *See* Gov't's Mot. 13.  But this argument is completely at odds with the government's position that there is no evidence Montalvo actually saw Plaintiff before running her over; if Montalvo did not see her, then he could not have been pursuing her in his vehicle.  Because the Court has already found above that there is no evidence Montalvo saw Plaintiff, the contention that Montalvo was pursuing her in an emergency situation is without merit.

Regarding Plaintiff's two companions, Montalvo's deposition testimony similarly forecloses the argument that Montalvo was pursuing them when he ran over Plaintiff.  According to Montalvo, he was patrolling on the vega that night, using his spotlight to investigate suspicious shadows.  He was not able to tell if certain shadows were people based only on the use of his spotlight, so he made a turn in his vehicle to the south.  Not until his headlights panned across the suspicious shadows and they stood up did he realize the shadows were people.  And, in what is crucial testimony for this point, Montalvo stated, "It was when I turned around and my headlight pointed at them, that's when I found out they were people, because they started to get up.  *And that's where I put the vehicle in park.*"  Montalvo Dep. 72:1-4 (emphasis added).  This, combined with the rest of Montalvo's testimony, shows that Montalvo never pursued any suspects in his vehicle.  At most, he patrolled in his vehicle to try to find suspects, but that does not make for an emergency situation.  As soon as he saw suspected violators of the law, meaning as soon as an emergency pursuit of the suspects could have begun, he parked his vehicle and got out to pursue them on foot.  Montalvo Dep. 87:3-14.  But by this point, he must have already run over Plaintiff, as he put the vehicle in park immediately after seeing the shadows resolve into

suspected illegal immigrants and heard Plaintiff screaming immediately after getting out of the vehicle.

The government's other arguments are also unavailing.  The government is correct in its argument that the Texas Supreme Court extended the protection against negligence suits to emergency operations of vehicles beyond the specifically enumerated otherwise-illegal acts, *see Martin*, 971 S.W.2d at 431, but the Texas Supreme Court nonetheless always expressed the protection against negligence as one available in emergency situations.  *See id.* at 428-431 (section 546.005 controls "action as an emergency vehicle operator *in an emergency situation*"; "we hold that section [section 546.005] imposes liability for reckless operation of an emergency vehicle *in an emergency situation*"; "the Legislature intended for emergency vehicle operators *in emergency situations* to be cognizant of public safety, but only intended to impose liability for reckless conduct"; "emergency vehicle operators must routinely make risky judgment calls *in emergency situations*") (emphases added). The Texas Supreme Court's repeated references to "emergency situation" appear to be a deliberate effort by the Texas Supreme Court to limit the reach of the privilege to such circumstances.  And while the government is also correct that Montalvo was patrolling the border, and that border patrols are integral to the way the Border Patrol fulfills its mission of securing the nation's borders, this importance does not mean that all patrols are per se emergencies.  Though the routine work of patrolling, whether patrolling the streets as a peace officer or the border as a Border Patrol Agent, is essential to law enforcement, the Texas legislature and courts have shown that it is not so important as to relieve those patrolling of the duty to operate their vehicles with due care when doing so.  *See id.* at 428-431.

Because the undisputed evidence shows that the Texas statute cited by the government does not protect Montalvo under these circumstances, the Court denies summary judgment for

the government based on Texas Transportation Code § 546.005.

### c.      Lack of evidence of Montalvo's intentional conduct

The government moves for summary judgment on Plaintiff's assault and battery claims

on the grounds that there is no evidence of intentional, knowing, or reckless conduct by

Montalvo in running over Plaintiff with his vehicle.[3]  Gov't's Mot. 15-16.  Plaintiff responds that

there is sufficient evidence from which to conclude that Montalvo acted intentionally or

recklessly.  Pl.'s Resp. to Gov't's Mot. 17-18.

In Texas, the elements of assault are identical in civil and criminal law.  *Hall v. Sonic*

*Drive-In of Angleton, Inc.*, 177 S.W.3d 636, 649-50 (Tex. App. 2005) (citing *Forbes v. Lanzl*, 9

S.W.3d 895, 900 (Tex. App. 2000)).  To prove assault, Plaintiff must show either (1) that

Montalvo intentionally, knowingly, or recklessly caused her bodily injury; (2) that he

intentionally or knowingly threatened her with imminent bodily injury; or (3) that he

intentionally or knowingly caused physical contact with her when he knew or should reasonably

have believed that she would regard the contact as offensive or provocative.  *See id.* (citations

omitted).  To prove battery, Plaintiff must show Montalvo intentionally or knowingly caused

physical contact with her when he knew or should reasonably should have believed she would

regard it as offensive or provocative.  *See Tex. Dept. of Public Safety v. Cox Tex. Newspapers,*

*L.P.*, --- S.W.3d ----, 2011 WL 2586861, at *12 (Tex. 2011) (citation omitted).

The Court agrees with the government that there is not sufficient evidence from which to

conclude that Montalvo acted intentionally or knowingly in running over Plaintiff with his

---

[3]      Because the government does not argue that there was no evidence Montalvo's actions in
moving Plaintiff instead of waiting for medical personnel to arrive were intentional or
reckless, the Court interprets this section of the Government's Motion as one for
summary judgment only on Plaintiff's claims of assault and battery based on Montalvo's
running her over with his vehicle.

vehicle, for the reasons set forth above in the discussion of Plaintiff's Fourth Amendment claim against Montalvo.  The Court also agrees with the government that the evidence presents no dispute of material fact concerning whether Montalvo's actions were reckless.  Under the Texas Penal Code's definition of recklessness, which applies here because the elements of assault are the same in a civil suit as in a criminal prosecution, *see Hall*, 177 S.W.3d at 649-50,

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

Tex. Penal Code § 6.03(c).

The undisputed evidence shows that driving on the vega is a common activity for Border Patrol Agents.  The agents are aware of possible risks involved in the activity, including concerns for possible immigrants hiding on the vega, and for the agents' safety from gunfire spilling across the border, but they still drive on the vega on a regular basis.  Thus, while it might be true that Montalvo acted with awareness of the risks, Plaintiff has presented no evidence that those risks were substantial and unjustifiable.  The undisputed evidence shows in fact that the ordinary Border Patrol Agent in Montalvo's situation would have done the same thing, because agents routinely drive on the vega.  It certainly cannot be said that Montalvo's actions in driving on the vega constituted a gross deviation from the standard of care.

Plaintiff attempts to show a dispute of material fact by pointing to Montalvo's deposition testimony that he was told of the dangers of driving on the vega, knew it was dangerous to do so, yet nonetheless persisted.  Pl.'s Resp. to Gov't's Mot. 16.  One section referred to by Plaintiff as proof that Montalvo was told of the dangers of patrolling reads,

Q.  Were you instructed by anyone or told by anyone of any particular dangers of

driving in that area?
A: Yes, sir.
Q: Okay.  And what were you told?
A: To make cuts and stuff like that.  To make -- make sure you -- make sure you
take care of your area and make sure there's no entries, and if there are, report
them.

Montalvo Dep. 30:16-24.

In this section, Montalvo appears to testify that he was actually instructed in how to effectively

patrol on the vega, rather than warned not to do it.

Under no reading of these questions and answers, contrary to Plaintiff's contentions, does

Montalvo concede that he was instructed in the dangers to others from driving on the vega.

Elsewhere in his deposition Montalvo does admit that he was aware it could be dangerous to

illegal immigrants to drive on the vega, but contends that he drove on there anyway because his

job involves an inherent amount of danger no matter what the action.  *Id.* at 78:23-79:17.  As he

put it, "Well, all we do, sir, is dangerous.  No matter where we're at, we're encountered with

dangerous situations, so --"  *Id.* at 79:15-17.  Taken together, Montalvo's testimony shows he

engaged in a somewhat dangerous course of action because it was the common and accepted

means of achieving his agency's objectives.  It does not show he disregarded a substantial and

unjustifiable risk, or that another agent in his place would have acted differently.

Plaintiff's final contention is that Montalvo acted recklessly by running Plaintiff over

after she squatted on the ground for seven minutes in plain view in the field of his headlights.

Pl.'s Resp. to Gov't's Mot. 16.  If Plaintiff means by this that Montalvo was reckless by seeing

her, but driving his car in her direction and running her over anyway, the Court has already

found that there is no evidence to show Montalvo actually saw Plaintiff.  If Montalvo is instead

arguing that Montalvo did not see her but should have, that argument fails, too.  If Montalvo did

not see her, he could not have acted in conscious disregard of the risk of running her over, apart

from disregarding the general risk to illegal immigrants described above, which the Court has already found was not substantial and unjustified.

Because none of Plaintiff's arguments or evidence shows a genuine dispute of material fact regarding Montalvo's intentionally, knowingly, or recklessly running over Plaintiff with his vehicle, the Court grants the government summary judgment on Plaintiff's assault and battery claims based on those factual allegations.

### d.      Unlawful acts rule

The government's fourth and final argument is that Texas's unlawful acts rule operates to defeat all of Plaintiff's claims in their entirety.  Gov't's Mot. 16-19.  Plaintiff responds that three exceptions to the illegal acts rule apply here, so that her claims are not barred.  Pl.'s Resp. to Gov't's Mot. 18-22.

Under Texas's long-standing unlawful acts rule, which is sometimes known as the illegal acts rule, "no action may be predicated upon an admittedly unlawful act of the party asserting it."  *Denson v. Dallas Cnty. Credit Union*, 262 S.W.3d 846, 855 (Tex. App. 2008).  The rule operates as a defense, and was first set out by the Texas Supreme Court more than a century ago:

> It may be assumed, as undisputed doctrine, that no action will lie to recover a claim for damages, if to establish it the plaintiff requires aid from an illegal transaction, or is under the necessity of showing or in any manner depending upon an illegal act to which he is a party . . . . In those cases where it is shown that, at the time of the injury, the plaintiff was engaged in the denounced or illegal act, the rule is, if the illegal act contributed to the injury, he cannot recover; but, if plaintiff's act did not contribute to the injury, the fact alone that at the time he was engaged in an act in violation of law will not of itself preclude a recovery.

*Gulf, C. & S.F. Ry. Co. v. Johnson*, 9 S.W. 602, 603 (Tex. 1888) (citations omitted).

"Courts have interpreted this defense to mean that if the illegal act is inextricably intertwined with the claim and the alleged damages would not have occurred but for the illegal act, the plaintiff is not entitled to recover as a matter of law."  *Sharpe v. Turley*, 191 S.W.3d 362, 366

38

(Tex. App. 2006) (citing *Ward v. Emmett*, 37 S.W.3d 500, 503 (Tex. App. 2001)).

The test for the "inextricably intertwined" aspect of the defense is to examine "whether the person seeking to enforce [his claim] requires any aid from the illegal transaction to establish his case." *See Marathon Oil Co. v. Hadley*, 107 S.W.2d 883, 885 (Tex. Civ. App. 1935) (quotation omitted). The *Marathon* court, in language used many times since by Texas courts, continued,

> No recovery can be had if it is necessary for the plaintiff to prove, as part of his cause of action, his own illegal contract or other illegal transaction. But the plaintiff may recover if he can show a complete cause of action without being obliged to prove his own illegal act, although such act may incidentally appear, and may be explanatory even of other facts in the case, it being sufficient if his cause of action is not essentially founded upon something which is illegal.

*Id.* (quotation omitted); *see, e.g., Macias v. Moreno*, 30 S.W.3d 25, 29 (Tex. App. 2000) ("However, if a party can show a complete cause of action without being obliged to prove their own illegal act, although the illegal act may appear incidentally and may be important in explanation of other facts in the case, they may recover.").

With regard to the causation aspect of the defense, the Texas Supreme Court has also clarified that the illegal act must have been a proximate cause of the plaintiff's injury. *Pyeatt v. Anderson*, 269 S.W. 429, 430 (Tex. Comm'n App. 1925); *Arredondo v. Dugger*, --- S.W.3d ----, 2011 WL 2120512, at *3 (Tex. App. 2011); *Petta v. Rivera*, 985 S.W.2d 199, 204 (Tex. App. 1998), *rev'd on other grounds sub nom. Texas Dep't of Public Safety v. Petta*, 44. S.W.3d 575 (Tex. 2001). The basic policy underlying the unlawful acts rule is "that individuals who have committed illegal acts shall not be permitted to profit financially or be otherwise indemnified from their crimes." *Saks v. Sawtelle, Goode, Davidson & Troilo*, 880 S.W.2d 466, 470 (Tex. App. 1994). Several courts have also held that the unlawful acts rule "should not be applied to circumstances in which it would not serve the policy considerations that justify it." *Flores v. ASI Computer Techs. Inc.*, Civil Action No. L-06-135, 2010 WL 2710713, at *5 (S.D. Tex. July 6,

2010).

Here, the Court finds the unlawful acts rule does not bar Plaintiff's claims because the common law unlawful acts rule does not apply to actions based on personal injury or death.  In 1987, the Texas legislature enacted a statute preventing convicted criminals from recovering damages caused by their own crimes.  *Arredondo*, 2011 WL 2120512, at *8.  That statute now reads in full,

> § 93.001. Assumption of the Risk: Affirmative Defense
>
>> (a) It is an affirmative defense to a civil action for damages for personal injury or death that the plaintiff, at the time the cause of action arose, was:
>>
>>> (1) committing a felony, for which the plaintiff has been finally convicted, that was the sole cause of the damages sustained by the plaintiff . . . .
>>
>> (b) This section does not apply in any action brought by an employee, or the surviving beneficiaries of an employee, under the Workers' Compensation Law of Texas, or in an action against an insurer based on a contract of insurance, a statute, or common law.
>>
>> (c) In an action to which this section applies, this section shall prevail over any other law.

Tex. Civ. Prac. & Rem. Code § 93.001.

In light of the fact that this section and the unlawful acts rule concern the same subject matter, yet the statute requires proof of a conviction while the rule does not, several courts have grappled with whether section 93.001 was intended to preempt the common law unlawful acts rule.  In *Rico v. Flores*, 481 F.3d 234 (5th Cir. 2007), the Fifth Circuit noted the issue as one reason why the contours of the unlawful acts rule were not entirely clear.  481 F.3d at 240-241.  The court recognized that the statute indicates that in cases to which the provision applies, it prevails over any other law.  *Id.* at 241.  But finding it improbable that the statute was actually meant to "prevail over all other law relating to civil actions for damages for personal injury or

40

death," the court did not endorse a plain reading of the statutory language. *Id.* However, the court also thought it "improbable that a statute that creates a narrow, specific defense to a wrongful death action would leave unaffected the much broader defense of the unlawful acts rule." *Id.*

The court cited the Texas appellate court's decision in *Ward* in support of the idea that the statute had not preempted the common law rule, since *Ward* cited the statute as an authority that provided a defense "similar" to the unlawful acts rule, but nowhere indicated that the statute preempted the rule. *Id.* at 241 n.5. The court did not rely upon *Ward* too heavily, though, observing that the *Ward* court's analysis of the relationship between the statute and the rule "was not especially searching." *Id.* In the end, though the Court believed the statute's applicability was limited to situations where subsections (a)(1) or (a)(2) would apply, it retreated from making any firm holding on the issue; in the absence of any state case law specifically on point the Fifth Circuit simply concluded that "there remain[ed] substantial uncertainty about the relationship of section 93.001 to the unlawful acts rule." *Id.* at 241.

Since the Fifth Circuit's opinion in *Rico*, at least one Texas state court has ruled on the issue, definitively holding that section 93.001 preempts the common law unlawful acts rule with regard to personal injury or death actions. *See Arredondo*, 2011 WL 2120512, at *9. In an extended examination of the relationship between the common law rule and the statute, the court in *Arredondo* concluded that the statute preempted the rule, and that all arguments to the contrary did not have merit. *Id.* at *9-11. First, the Court found the scope of the rule and the statute were very similar, while the statute's requirements were more restrictive, so that if a defendant continued to have recourse to the liberal defense afforded by the rule, there would be no point to the more limited defense afforded by the statute. Any situation meeting the strict

41

requirements of the statute would also meet the requirements of the rule. *Id.* at *9. Second, in subsection (c) the legislature clearly and unequivocally expressed its intent that section 93.001 prevail over any other laws. Though it did not explicitly state that it was abrogating the common law unlawful acts rule, the court found the broad phrase "any other law" included the rule, so that it was impliedly abrogated. *Id.* Third, though the common law rule was based on public policy, because the legislature has the power to set or change public policy at any time the Court ruled that "the specific public policy established by the express language of section 93.001 controls over the general policy supporting the unlawful acts doctrine." *Id.* at 10.

Fourth, in direct contradiction to the Fifth Circuit's analysis of statute in *Rico*, the *Arredondo* court held that the phrase "an action to which this section applies" meant "civil actions for damages for personal injury or death other than those circumstances excepted from the statute by" subsection (b). *Id.* The defendant argued along the lines set out in *Rico* that the statute only applied to actions set forth in subsections (a)(1) or (a)(2), such as those in which the plaintiff has been convicted. *Id.* The court rejected this reading as rewriting the language of the statute, and stated that the "language and structure of subsection (a) indicates there is a distinction between the action to which section 93.001 applies and the elements of the affirmative defense that must be proved to establish the statutory affirmative defense." *Id.* Fifth, the court rejected a proposed reading of the statute as creating a bright line defense, presumably as opposed to the muddier standard of the unlawful acts rule, reiterating that for cases in which the plaintiff had been convicted, "the statutory defense would be unnecessary if the defendant could obtain the same defense under the unlawful acts doctrine without the additional elements of proof required by section 93.001." *Id.* at 11. Sixth, the court did not dispute that the unlawful acts rule and section 93.001 could coexist, but maintained that they could only do so if the

unlawful acts rule applied to actions other than those involving personal injury or death.  The

court declined to reach the question of whether the rule did continue to apply to other actions,

merely noting that it was a possibility.  *Id.*

Finally, the court distinguished those cases decided since the enactment of section 93.001

that did not deal with the issue.  *Id.*  The court also distinguished *Ward*, which the Fifth Circuit

had relied upon as evidence, albeit weak evidence, that section 93.001 did not abrogate the

unlawful acts rule.  *Id.* at 9.  In the *Arredondo* court's analysis, there was no indication that the

parties had raised preemption as an issue in *Ward*.  *Id.*  Even if they had, because the plaintiff in

*Ward* had been convicted of the crime that the defendant argued barred her recovery, the *Ward*

court had no occasion to rule upon the preemption issue.  *Id.*  Accordingly, the *Ward* court did

not need to reach the issue of abrogation or preemption by section 93.001, so that its statement

on the similarity of the remedies afforded by the two doctrines was "unnecessary."  *Id.*

The Court finds the *Arredondo* court's searching inquiry to present a thorough analysis of

the issue, and believes it cogently addressed any potential counter-arguments against a finding of

preemption.  Thus, the Court believes that if and when the Texas Supreme Court is called upon

to rule on the issue, based on the same reasons as the *Arredondo* court it would hold that section

93.001 preempts the common law unlawful acts rule for cases involving claims based on

personal injury or death and that are not excluded by the terms of 93.001(b).

Here, Plaintiff's claims are based on her personal injuries, so the statute preempts the

common law rule with regard to her claims, but the statute is not satisfied.  While the

government argues that Plaintiff violated federal immigration laws when she crossed the border

at a place other than a port of entry, and it does in fact appear that she did so, the government has

not proven that Plaintiff was convicted of this offense, that the offense was a felony, or that the

offense was the sole cause of the damages she sustained.  Therefore, the Court finds the

government has not met the requirements of section 93.001, and denies the government's request

for summary judgment on that basis.

Alternatively, even if the common law rule did somehow apply to this case, the Court

agrees with Plaintiff that it would not bar her claims.  The rule only bars claims that are

"inextricably intertwined" with Plaintiff's unlawful act, meaning that Plaintiff cannot prove her

case without also proving her violation of the law.  *See Marathon Oil*, 107 S.W.2d at 885.  To

prove assault, Plaintiff need only show Montalvo intentionally, knowingly or recklessly caused

her injury, or that he intentionally or knowingly threatened her with injury or caused offensive or

provocative contact.  *Hall*, 177 S.W.3d at 649-50 (citations omitted).  To prove battery, Plaintiff

need only show Montalvo intentionally or knowingly caused physical contact with her when he

knew or should reasonably have believed she would regard it as offensive or provocative.  *See*

*Cox Tex. Newspapers*, 2011 WL 2586861, at *12 (citation omitted).  To prove negligence,

Plaintiff need only show Montalvo owed her a duty as a driver of a vehicle, that he breached that

duty, and that Plaintiff's damages proximately resulted from Montalvo's breach.  *See Firestone*

*Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 613 (Tex. 1996).

It is not necessary for Plaintiff to prove she was an illegal immigrant for her to prove

these elements of her causes of action.  As Plaintiff argues, that she was on the vega is all that

she need prove; the precise reason for her being on the vega, and what she had done just prior to

arriving on the vega, are not material.  The injuries Plaintiff sustained when she was run over by

Montalvo's vehicle did not depend upon her immigration status; illegal alien, nonresident alien,

resident alien, or citizen, her injuries would have been the same.  To be sure, a factfinder would

wonder what she was doing on the vega, so that the explanation of her illegal immigration would

be helpful in giving context to the accident, but it would not strictly be necessary.  In other words, the fact of Plaintiff's illegal immigration would be one of those facts that "may incidentally appear, and may be explanatory even of other facts in the case," but it does not mean that her causes of action are "essentially founded upon something which is illegal."  *Marathon Oil*, 107 S.W.2d at 885.

To the extent that Plaintiff's illegal conduct would be relevant to this action, it would be as a result of either the government or Montalvo raising her conduct— specifically, her illegal border crossing, consequent motive to hide, and her dark clothing—as a defense, to buttress a contention that Plaintiff was hidden on the vega and not in plain sight as she claims.  But when the illegal conduct arises in a defense and not in the plaintiff's case, the unlawful acts rule will not bar a plaintiff's claims.  *See St. Louis, B. & M. Ry. Co. v. Price*, 269 S.W. 422, 428 (Tex. Comm'n App. 1925); *Associated Milk Producers v. Nelson*, 624 S.W.2d 920, 924 (Tex. Civ. App. 1981) (even when a claim is connected with an illegal act, "recovery may still be had if the plaintiff requires no aid from the illegal transaction to establish his case") (citing *Morrison v. City of Fort Worth*, 155 S.W.2d 908 (Tex. 1941)).  Because proof of her illegal conduct would not be necessary for her to prove her own case, the unlawful acts rule would not apply.

Finally, if the unlawful acts rule did apply by its terms, on public policy grounds the Court would nonetheless hold that it does not bar Plaintiff's claims.  The unlawful acts rule "should not be applied to circumstances in which it would not serve the policy considerations that justify it."  *Flores*, 2010 WL 2710713, at *5.  The policy underlying the rule is to prevent criminals from profiting from or being indemnified for their crimes.  *Saks*, 880 S.W.2d at 470. Allowing Plaintiff to proceed with her claims does not insulate her from the punishment for her crime, nor does it encourage others to commit the same crime in the future.  And because

allowing Plaintiff's claims to proceed would not profit her, indemnify her from the result of her crime, or encourage others to commit the same crime, if the unlawful acts rule did apply here the Court would decline to enforce it on public policy grounds.  *See Flores*, 2010 WL 2710713, at *6 (declining to enforce the rule where enforcement would not serve the rule's purpose).

Accordingly, the government's request for summary judgment based on the unlawful acts rule is denied.

## III.     CONCLUSION

For the reasons set forth above, Montalvo's Motion, ECF No. 65, is **GRANTED**.  The Government's Motion, ECF No. 66, is **GRANTED** in part, **DENIED** in part.  The Government's Motion is **GRANTED** as to its request for summary judgment on Plaintiff's assault and battery claims based on running Plaintiff over in his vehicle because there is no evidence that Montalvo acted intentionally or recklessly in doing so.  The Government's Motion is **DENIED** as to its requests for summary judgment based on the discretionary function exception, Texas Transportation Code, and unlawful acts rule.

**SO ORDERED.**

**SIGNED** on this 2nd day of September, 2011.

_Kathleen Cardone_
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE

46